## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DONALD R. PEVIA,                                     *

Plaintiff,                                           *

v.                                                   *          Civil Action No. ELH-21-111

G. WARREN, *Warden, et al.*,                         *

Defendants.                                          *
                                                  ***

## <u>MEMORANDUM OPINION</u>

Donald R. Pevia, the self-represented plaintiff, has filed suit against multiple defendants, pursuant to 42 U.S.C. § 1983.  ECF 1.  He has appended several exhibits to the suit.  ECF 1-1. The defendants include former Assistant Warden Gregory Werner, former Commissioner of Corrections Wayne O. Hill, Acting Warden Richard Roderick, and Lt. Vaughn Whiteman, a correctional officer.[1] Pevia alleges that defendants violated his rights under the First and Eighth Amendments to the Constitution.  In addition, he alleges that the terms of a settlement agreement in an earlier case, ELH-14-631, were violated when defendants prohibited him from attending religious services.  Pevia seeks compensatory and punitive damages as well as injunctive and declaratory relief.

Defendants have moved to dismiss or, in the alternative, for summary judgment.  ECF 13. The motion is supported by memorandum (ECF 13-1) (collectively, the "Motion") and exhibits, including declarations of Correctional Case Management Specialist II John White (ECF 13-2), Correctional Case Management Specialist II Benjamin Bradley (ECF 13-3) and Chaplain Kevin

---

[1] In the Complaint, plaintiff references defendant "G. Warren," and describes him as the Warden.  The Clerk shall amend the docket to reflect his correct name, Gregory Werner.

Lamp (ECF 13-4). Pevia was notified of his right to respond to the motion (ECF 14) and he has done so. ECF 18; ECF 19.[2] He also submitted exhibits.

No hearing is necessary. *See* Local Rule 105.6. For the reasons discussed below, I shall grant the Motion.

## I.      Background

A. Plaintiff's allegations

At all times relevant to the Complaint, Pevia was confined at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. ECF 1. He filed this suit on January 13, 2021, arising from the denial of his participation in Native American worship services in February and March of 2020. In particular, Pevia alleges that he was released from disciplinary segregation on February 14, 2020, and placed in general population in Housing Unit ("HU") 2. On March 2, 2020, he submitted a religious preference form but was not placed on the pass list to attend weekly services. ECF 1-1 at 1, 26. Pevia explains that his religion mandates that he participate in religious services on grass or dirt and that the only Native American worship hoop is located between HU 3 and HU 4. ECF 1-1 at 26.

According to Pevia, Lt. Whiteman instituted a policy that prevented inmates living in HU 2, where Pevia was housed, from attending religious services with inmates from HU 3 or HU 4, or from leaving HU 2 to attend services. ECF 1-1 at 26. Despite this policy, another inmate in his housing unit, Norman Mayes, was placed on the list for Native American services. *Id.*

---

[2] ECF 18 is titled "Motion For Summary Judgment, And Response To Defendants [sic] Motion to Dismiss." Therefore, it was docketed at ECF 18 as the opposition and at ECF 19 as a motion. I shall construe it as an opposition. To the extent it is a summary judgment motion, it is without merit.

Additionally, Pevia alleges that the conduct of defendants breached the settlement agreement he entered in Civil Action ELH-14-531.  It provided, in part, that each time the Iron House Council visited NBCI they would meet with Pevia outside to engage in a Native American religious visit with a lit pipe.  ECF 1-1 at 13.[3]

The settlement agreement was executed on August 2, 2016.  By its terms, it expired three years after its effective date. ECF 1-1 at 13.  Pevia concedes that the settlement agreement is no longer in effect.  ECF 18 at 11.

Pevia filed an Administrative Remedy Procedure ("ARP") on March 5, 2020,  concerning the failure to add him to the Native American worship pass list.  ECF 1 at 2; ECF 1-1 at 1-2 (ARP NBCI-0505-20). The ARP was denied at the institutional level.  But, on July 20, 2020, on appeal to the Commissioner, the ARP was found "meritorious in part."  ECF 1-1 at 7.  The Commissioner said, *id.*:

> [S]taff failed to adhere to OPS. 140.0002. The Religious Services Manual, OPS 140.0002 Attendance section F(3) states, "The Managing Official or his/her designee shall afford reasonable opportunity for offenders to attend congregate worship."
>
> Staff failed to follow proper procedures in communicating with the Chaplain's Office to have you placed on the Native American religious services list when you were released form segregation. However the failure in the procedural process of communicating your request to attend your religious worship does not demonstrate any malicious intent on the part of the Administration or staff.

Further, the Commissioner directed the Warden to ensure compliance with OPS. 140.0002 and to develop an efficient procedure to communicate with the Chaplain's Office when an inmate who is released from disciplinary segregation asks to be placed on a religious service pass list.  *Id.*

On September 24, 2020, the Inmate Grievance Office ("IGO") dismissed Pevia's appeal.

---

[3] No members of the Iron Horse Council visited NBCI between February 13, 2020 and March 22, 2020.  ECF 13-2, ¶ 8.

*Id.* at 8.   The IGO reasoned that "[r]estrictions on inmate gatherings in response to heightened security concerns" are permissible, within the ordinary incidents of prison life.[4]   Further, the IGO said:  "[D]ue to pandemic conditions, congregate services have been suspended."  *Id.*

On March 21, 2020, while Pevia was pursuing the ARP referenced above, he filed a second ARP:  NBCI-0675-20.  There, he complained that, since March 5, 2020, he had been denied access to Native American worship services and that the denial breached his settlement agreement.  ECF 1 at 2; ECF 1-1 at 9.

The ARP was denied at the institutional level.  *Id.*  It was noted that at the time the ARP was filed Pevia was assigned to HU 2 and "Inmates assigned to HU2 are permitted to attend congregate services with other inmates who are also assigned to HU2." ECF 1-1 at 9. But, the denial further noted that on March 22, 2020, Pevia was assigned to HU 1, *i.e.*, disciplinary segregation, and inmates so assigned "are not permitted to exit the building to attend congregate religious services. . . ."  *Id.*  On appeal of the denial, Pevia argued that his assignment to HU 1 did not explain why he was not permitted to attend religious services while assigned to general population. *Id*. at 11. Pevia's appeals to the Commissioner and then to the IGO were denied.  ECF 1 at 4.

B.  Defendants' response

Lt. White explains in his Declaration (ECF 13-2) that religious preference forms are used to identify an inmate's preferred religion.  *Id.* ¶ 5. Because Pevia had already identified his religious preference as Native American, had he submitted the forms as alleged, Chaplain Lamp would not need to take any action because Pevia was already identified as a Native American. *Id*.

---

[4] The IGO did not specify what restrictions on inmate gatherings were in place or what heightened security concerns existed.

Further, NBCI's 2020 Inmate Handbook instructs inmates who are released from special confinement housing (such as disciplinary segregation) and who wish to return to their faith's pass list to notify the Administrative Chaplain by: 1) writing a request form to the Chaplain requesting to be returned to the service list; or 2) notifying the facilitator of that faith group of the desire to be placed back on the service list. *Id.* ¶ 6; ECF 13-3 at 2; ECF 13-4, ¶ 5. Pevia did not follow the proper procedure to be added back to the Native American service pass list. ECF 13-2, ¶ 12.

Pevia was returned to general population from special confinement housing on Thursday, February 13, 2020. ECF 13-2, ¶ 7; ECF 13-4, ¶ 4. Thursday is the designated day for the Native American service. But, because Pevia was moved from segregated confinement to general population on that day, he was not able to attend the service. ECF 13-2, ¶ 7. Native American services were again held at NBCI on February 20, and March 5, 2020. *Id.* It is not known whether Native American services were held on March 12, because the pass list was not turned into the Chaplain. *Id.* However, since March 19, 2020, all religious services were cancelled due to the COVID-19 pandemic. *Id.* And, Pevia returned to special confinement housing on March 22, 2020. *Id.* ¶ 12

Chaplain Lamp asserts in his Declaration (ECF 13-4) that he did not receive a Religious Preference form from Pevia or a request that he be added to the pass list. *Id.* ¶ 7. He avers that had Pevia submitted a request to be added back to his faith's pass list he would have added Pevia to the list. *Id.* ¶ 6.

Defendants explain that due to Pevia's moving on and off of special confinement housing many times over the years of his incarceration he has been removed and added to the Native American worship pass list on a number of occasions, evidencing his understanding of the process. ECF 13-2, ¶ 11. For example, on June 20, 2017, he was removed from special confinement housing

and added to the Native American pass list on July 11, 2017.  ECF 13-2, ¶ 11; ECF 13-3 at 6.  On August 28, 2018, he was removed from special confinement housing and returned to the Native American pass list on September 4, 2018.  ECF 13-2, ¶ 11; ECF 13-3 at 2.  He was removed from special confinement housing on November 8, 2018, and returned to the Native American pass list on November 22, 2018.  ECF 13-2, ¶ 11; ECF 13-3 at 23.  He was removed from special confinement housing on August 21, 2019, and returned to the pass list on September 5, 2019.  ECF 13-2, ¶ 11; ECF 13-3 at 30.

## II.    Standards of Review

### A.

Because Pevia is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### B.

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  *See* ECF 13.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil

Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland,* 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC,* 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's

consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin,* 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv*. *Co*., 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC,* 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit acts at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an

adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Harrods*, 302 F.3d at 244 (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se."  *Putney*, 656 F. App'x at 638.

Pevia has not filed an affidavit under Rule 56(d).  I am satisfied that it is appropriate to address defendants' motion as one for summary judgment as to defendant Whiteman and as a motion to dismiss as to defendants Hill, Werner, and Roderick, because this will facilitate resolution of this case.

## C.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *see In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.,* 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young,* 569 U.S. 221 (2013); *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan*

*Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions'...."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir.

2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if...[the] actual proof of those facts is improbable and...recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff."  *E.I. du Pont de Nemours & Co*., 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin*., 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc*., 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), cert. denied, 565 U.S. 943 (2011).  But, a court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty*., 628 F.3d 140, 146 (4th Cir. 2010).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion.  *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint,

the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies...if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodma*n, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co*., 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein...." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger.,* 510 F.3d at 450.

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543

U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, ___ F. App'x ___, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). And, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. In other words, the "general rule" is that "the exhibit prevails in the event of a conflict between an attached exhibit and the allegations of a complaint." *Id.* at 165. But, "in cases where the plaintiff attaches or incorporates documents for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of the document as true." *Id.* at 167.

### D.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  But, summary judgment is appropriate if the evidence is "so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 252.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus,

the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (citation omitted). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

In sum, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Judd*, 718 F.3d at 313. On the other hand, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.    Discussion

A.  Official Capacity Claims

Plaintiff has sued each defendant individually and in his official capacity. ECF 1 at 2. He also asserts that each defendant has acted "under color of State law." *Id.*

16

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. amend XI. The Eleventh Amendment did not create sovereign immunity. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth*., 535 U.S. 743, 760 (2002).

States enjoy immunity from suits brought in federal court by their own citizens, even though the text of the Eleventh Amendment does not explicitly address such a scenario. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). In other words, under the Eleventh Amendment, a private individual is barred from bringing a suit against a state in federal court to recover damages, unless an exception to sovereign immunity applies. *See Coleman v. Ct. of Appeals of Md*., 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)).

Of import here, sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," absent waiver or a valid congressional abrogation of sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); M*cCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

Under the Eleventh Amendment, damages claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity. This is because such a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

There are, however, three exceptions to the Eleventh Amendment's prohibition of a suit against a state or an arm of the state. *In Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. Frew ex rel. *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

The State of Maryland has not waived immunity for claims brought pursuant to § 1983. Based on the foregoing, the individual defendants are immune from suit for monetary damages under 42 U.S.C. § 1983.

B. Personal Participation

The Complaint does not allege any personal participation by Commissioner Hill, former Assistant Warden Werner, and Acting Warden Roderick in regard to the alleged denial of Native American worship. Liability under §1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Other than being named in the caption of the Complaint, and stating that Hill, Werner, and Roderick held supervisory positions, these defendants are not mentioned anywhere in the factual allegations of the Complaint.

Pevia does not attribute any action or inaction to these defendants that resulted in his being denied access to Native American worship. Simply stated, Pevia's allegations fail to state a claim against defendants Hill, Werner, and Roderick.

C. Respondeat Superior

It is well established that the doctrine of respondeat superior[5] does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a

---

[5] Respondeat superior is a legal doctrine that provides an employer is liable in certain instances for the wrongful acts of an employee. *See Black's Law Dictionary* (8th ed. 2004).

pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Where, as here, a plaintiff points to no action or inaction on the part of supervisory defendants that resulted in a constitutional injury, the claims against supervisory personnel must be dismissed.

In his response, Pevia clarifies that he seeks to hold Roderick liable because Roderick's review of the two ARP appeals submitted by Pevia reached, in Pevia's opinion, contradictory results. ECF 18. To the extent Pevia seeks to hold Roderick liable due to his involvement in the grievance process, Pevia fails to state a claim. Without subjective knowledge, a prison official is not liable.

Decisions made during the administrative grievance do not alone establish liability. *Whittington v.Ortiz,* 307 Fed, Appx. 179, 193 (10th Cir. 2009) (stating that "denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations."); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation). As such, Pevia's complaints regarding Roderick's handling of his ARP appeals is unavailing.

D.  First Amendment

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  Nevertheless, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility

of punishment.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972).  But, that retained right is not unfettered.  Prison restrictions that impact on the free exercise of religion, but which are related to legitimate penological objectives, do not run afoul of the Constitution.  *See Turner v. Safely*, 482 U.S. 78, 89-91 (1987).

The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question.  In addition, this court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive.

As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause, Pevia must allege that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion.  *See Wilcox v. Brosn*, 877 F. 3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).  A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Thomas*, 450 U.S. at 718.  But, as indicated, prison restrictions that impact on the free exercise of religion, which but are related to legitimate penological objectives do not run afoul of the constitution.  *See Safely*, 482 U.S. at 89-91.

Pevia does not allege or show that the three week disruption in services compromised his religious beliefs.

Courts have regularly held that the occasional failure to provide religious services, such as occurred in Pevia's case, is not a substantial burden on religious exercise, in the absence of evidence suggesting that occasional missed services compromises an inmate's religious beliefs.

*See Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (affirming judgment denying relief where plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs"); *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (concluding that plaintiff established substantial burden where he was deprived of congregational prayer during Ramadan for 24 of 30 days); *see also Williams v. Bragg*, 537 F. App'x 468, 468-69 (5th Cir. 2013) (concluding that the plaintiff did not establish substantial burden on his religious exercise by "occasional cancellation of Muslim services"); *Canell v. Lightner*, 143 F.3d 1210, 1211-14 (9th Cir. 1998) (explaining that "relatively short-term and sporadic" interference with religious exercise does not amount to a "substantial" burden).

Further, Pevia must establish that defendants intentionally interfered with his religious practices. Negligent interference with religious exercise is not remediable under either the First Amendment or the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000c-5.[6] *Lovelace*, 472 at 194; *see Meyer v. Teslki*, 411 F. Supp. 2d 983, 991 (W.D. Wis. 2006) (holding a prison official violates an inmate's rights under RLUIPA if he **intentionally** and without sufficient justification denies an inmate his religiously mandated diet.) (emphasis added); *Lewis v. Mitchell*, 416 F.Supp.2d 935, 942–44 (S. D. Cal. 2005). In short, to state a valid claim under § 1983, Pevia must assert conscious or intentional interference with his free exercise rights. *Lovelace*, 472 F.3d at 201.

The parties agree that from the time of Pevia's release from special confinement housing on February 13, 2020, until congregate worship services were suspended in light of the COVID-

---

[6] The substantial burden analysis of Pevia's First Amendment claims is the same as the analysis conducted under RLUIPA, and RLUIPA affords plaintiffs a more demanding level of scrutiny if they establish a substantial burden. *Greenhill v. Clarke,* 944 F.3d 243, 250 (4th Cir. 2019); *Lovelace*, 472 F.3d at 186-87, 199-200.

19 pandemic on March 19, 2020, Pevia was not placed on the pass list for Native American services. The record reflects that, at most, he missed three services that he was otherwise eligible to attend.

Although Pevia filed religious preference forms, those were not then the proper vehicle for being returned to the pass list. Further, there is no evidence that the forms submitted by Pevia were received by Chaplain Lamp or the Native American worship facilitator, the two people with the authority to have Pevia added to the pass list.  To be sure, Pevia's first ARP regarding this issue was found meritorious in part because certain internal procedures were not followed.  But, this does not change the determination that no evidence exists that any of the named defendants acted to intentionally deny Pevia access to his religious services.  Rather, it appears that there was a misunderstanding by Pevia as to which documents were necessary to effectuate his return to the pass list, and perhaps an inadvertent failure to properly construe and process the forms he submitted.  Inadvertence and negligence do not state a constitutional claim, however.

As to Pevia's claim that Whiteman created a policy that HU 2 inmates could not attend worship services with inmates from HU 3 and HU 4, this allegation is also unavailing.  First, even if such a policy existed, Pevia does not explain how that policy would prevent him from attending Native American worship services or how the policy substantially impacted his religious observance.  Although defendants do not address this allegation specifically, the institutional response to ARP-0675-20 stated, contrary to Pevia's contention, that Pevia was permitted to attend congregate services with other HU 2 inmates.

Further, Pevia's proffered affidavit from inmate Adrian Ashton does nothing to advance his claim.  Ashton states that in January of 2020, while Pevia was on special confinement housing, he and other Native American worshipers on HU 2 were prohibited from going to their weekly

services due to Whiteman's alleged policy. ECF 18-1 at 7. However, sometime thereafter everyone on the housing unit who identified as a Native American worshiper, except inmate Norman Mayes, was transferred to HU 3. *Id.* at 3. Neither Ashton nor Pevia explains whether the inmates, once on HU 3, resumed Native American services, or how this conduct, which did not occur while Pevia was on HU 2, is relevant to Pevia's not being placed on the pass list for three weeks.

Presumably, the affidavit is offered in support of Pevia's contention that Whiteman created a policy that prevented all Native American worshipers on HU 2 from attending congregate services. However, Pevia also provided evidence that inmate Norman Mayes, a Native American who remained on HU 2, was nevertheless placed on the Native American worship pass list for March 19, 2020. ECF 18-1 at 9. This evidence contradicts Pevia's conclusory assertion that it was Whiteman's "policy," rather than a simple mix up in paperwork, that prevented Pevia from being added to the pass list and attending congregate services. As there is no evidence that Whiteman's alleged policy of prohibiting HU 2 inmates from worshiping with inmates from other housing units was the reason Pevia was not timely added to the pass list, Pevia's claim must fail.

The court does not dispute Pevia's sincerely held religious belief. But, Pevia fails to allege or demonstrate that the denial of congregate prayer on three occasions resulted in a substantial burden to his religious practice or that defendants acted intentionally to deprive him of his religious practice. For these reasons, his Free Exercise claim fails and Whiteman is entitled to summary judgment.

E. Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth

Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) ).  To establish an Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation.  *Williams*, 77 F.3d at 761.  While Pevia asserts in his Complaint that his rights under the Eighth Amendment were violated, he does not explain how, and there is no evidence before the court of such a violation.

F.  Violation of Policy

If Pevia's intention is to assert that defendants violated State policies, procedures, rules, regulations, or State law, the mere violation of State law or regulation does not provide a basis for a due process violation.  *See, e.g. Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Riccio v. Cnty. of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990) ("If the state law grants more procedural rights than the Constitution would otherwise require, a State's failure to abide that law is not a federal due process issue").  Accordingly, any First Amendment claim Pevia seeks to raise in connection with the processing of his religious preference form is without merit.

G. Injunctive Relief

As to Pevia's request for injunctive relief, a party seeking a preliminary injunction or temporary restraining order must establish the following elements:  (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

For the reasons discussed above, Pevia has failed to demonstrate the likelihood of success on the merits.  Therefore, his request for injunctive relief must be denied.

### IV.     Conclusion

For the foregoing reasons, I will grant defendants' Motion.[7]  In particular, I shall dismiss the claims against defendants Commissioner Wayne O. Hill, former Assistant Warden Gregory Werner, and Acting Warden Richard Roderick.  And, I shall grant summary judgment in favor of Whiteman.

A separate Order follows.

December 14, 2021                              _____/s/_____
Date                                                    Ellen L. Hollander
                                                          United States District Judge

---

[7] Having found no constitutional violation, I need not consider defendants' qualified immunity argument.